```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
                                      :      23cv3775(DLC)
HK CAPITAL LLC,                       :
                                      :
                                      :        OPINION
                   Plaintiff,         :       AND ORDER
           -v-                        :
                                      :
FEDERAL DEPOSIT INSURANCE CORPORATION, :
as receiver for SIGNATURE BANK, et al.,:
                                      :
                   Defendants.        :
--------------------------------------X
```

APPEARANCES:

For the plaintiff HK Capital LLC:
Peter Moulinos
Daniel Levinas
Moulinos & Associates LLC
150 E. 58th Street, 25th Floor
New York, NY 10155

For the defendants Federal Deposit Insurance Corporation, as
Receiver for Signature Bank and as Receiver for Signature Bridge
Bank, N.A.:
John N. Orsini
Dania Bardavid
Friedman Kaplan Seiler Adelman & Robbins LLP
7 Times Square, 28th Floor
New York, NY 10036

For the defendant Federal Deposit Insurance Corporation in its
Corporate Capacity:
Jason Charles Benton
FDIC
3501 N. Fairfax Drive
Arlington, VA 22226

For the defendant Flagstar Bank, N.A.:
H. Christopher Boehning
David K. Kessler
Meaghan Brennan
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

DENISE COTE, District Judge:

HK Capital LLC ("HK Capital") brought this action in 2021 against Signature Bank ("Signature") in connection with the unauthorized transfer of funds in 2018 and 2019 from its account at Signature.  Signature became insolvent in 2023, the Federal Deposit Insurance Corporation ("FDIC") became its receiver, and defendant Flagstar Bank, N.A. ("Flagstar") purchased its assets. The FDIC-related entities named in this action and Flagstar have moved to dismiss, or for summary judgment on, each of the claims against them in the third amended complaint ("TAC").  For the following reasons, the motions are granted.

## Background

At issue in these motions are seven claims filed by HK Capital against the FDIC-related entities and Flagstar.  These defendants have moved to dismiss claims three to five and have moved for summary judgment on claims nine to twelve in the TAC.[1] The following facts are largely taken from the TAC and documents upon which it relies.  They are undisputed unless otherwise noted.

HK Capital provides cash advances to merchants in exchange for a percentage of the merchants' revenue.  Since April 2017, HK Capital maintained a bank account with Signature.  HK Capital

---

[1] The remaining claims in the TAC are brought against a co-defendant or have been voluntarily dismissed by stipulation.

regularly transferred money out of its bank account to send it to its merchant clients.

Between April and June 2019, a Signature employee or employees diverted over $3 million from HK Capital's bank account by altering payment orders.  These funds are referred to as diverted payment orders ("DPOs").

Signature informed its insurers, including Zurich N.A. ("Zurich"), of the DPOs and filed claims for reimbursement. Zurich advised Signature that it could not process Signature's claims because it had insufficient information as to whether the claims arose out of misconduct on the part of a Signature employee.

Signature became insolvent in early 2023.  On March 12, 2023, the New York State Department of Financial Services closed Signature.  The Office of the Comptroller of the Currency ("OCC") appointed the FDIC as Signature's receiver ("FDIC-R1"). FDIC-R1 and the FDIC in its corporate capacity ("FDIC-C") established Signature Bridge Bank N.A. ("Bridge Bank") as the successor to Signature.

Pursuant to a Transfer Agreement dated March 12, 2023 (the "Bridge Agreement"), FDIC-R1 transferred all of Signature's deposits to Bridge Bank.  FDIC-R1 retained any liabilities arising from litigation to the extent that either FDIC-1 or Signature was then a defendant or defending a claim.  On March

3

20, the OCC closed Bridge Bank and appointed the FDIC as its receiver ("FDIC-R2").  On the same day, Flagstar, a national bank, entered into a purchase and assumption agreement ("Flagstar Agreement") with FDIC-C and FDIC-R2.  Pursuant to § 2.1 of the Flagstar Agreement, Flagstar assumed deposits from Bridge Bank, i.e., the deposits credited to the account on March 20, 2023.  It expressly declined to assume any liabilities of Bridge Bank or of FDIC-R2.

The receivership is administratively insolvent.  Therefore, an allowed general unsecured claim against the receivership is unlikely to receive any monetary distribution.

This action was filed in New York state court on June 14, 2021, against Signature and Nicky G Development Group LLC ("Nicky G").  Nicky G held an account in Signature Bank and is alleged to have received $100,000 in an unauthorized transfer of the plaintiff's funds.

The plaintiff filed an amended complaint on October 12.  On December 14, Signature moved to dismiss, arguing that the plaintiff's claims were time-barred.  On April 18, 2022, the New York Supreme Court denied Signature's motion.  It ruled that the plaintiff was not on notice of any fraudulent activity of Signature because the plaintiff's account statements did not disclose the recipients of transfers out of the accounts other than by identifying the last four digits of their account

numbers and, therefore, its claims were not subject to the
applicable statute of repose.  HK Capital LLC v. Signature Bank,
No. 653763/2021, 2022 WL 1210361, *1 (N.Y. Sup. Ct. Apr. 18,
2022).

On May 1, 2023, after Signature's closure, FDIC-R1 was
substituted into this litigation.  On May 4, FDIC-R1 removed
this action to federal court.

Meanwhile, on April 5, 2023, the plaintiff filed a
statement of claim with FDIC-R1, pursuant to 12 U.S.C. §
1821(d)(3), requesting that FDIC-R1 return the amount of the
DPOs.  On September 23, FDIC-R1 notified the plaintiff that it
had reviewed the plaintiff's "general unsecured claim" and
denied payment.  This action had been stayed to permit plaintiff
to exhaust its administrative remedies.  With the denial of its
claim, the stay was lifted.

On December 19, the plaintiff filed its second amended
complaint.[2]  On January 30, 2024, the plaintiff filed the TAC.
The TAC includes twelve claims, seven of which are brought
against FDIC-R1, five of which are brought against FDIC-2 and
Flagstar, and three of which are brought against FDIC-C.  On
February 6, the FDIC, Flagstar, and the plaintiff stipulated to

---

[2] On June 2, 2022, defendant Nicky G filed its answer to the
plaintiff's amended complaint.  Nicky G appeared in this action
in federal court on May 15, 2023.

the dismissal of the sixth, seventh, and eighth causes of action.  Defendants FDIC-R1, FDIC-R2, FDIC-C, and Flagstar filed their respective motions to dismiss on February 9.  The motions became fully briefed on March 22.

## Discussion

The plaintiff presently asserts seven claims against FDIC-1, FDIC-2, FDIC-C, and/or Flagstar.  These include two claims for declaratory judgment, one claim of breach of the duty of commercial reasonableness, and one claim each for failure to comply with New York Uniform Commercial Code ("UCC") §§ 4-A-303, 4-A-302, 4-A-202, and 4-A-204.

Before addressing the individual claims, it is useful to describe the roles played by the FDIC entities which have been named as defendants in this action and their statutory authority.  Under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), the FDIC is authorized to act as a receiver for an insured depository institution that becomes insolvent.  12 U.S.C. § 1821(c).  As receiver, the FDIC succeeds to "all rights, titles, powers, and privileges" of the financial institution.  Id. at § 1821(d)(2)(A)(i).  Thus, FDIC-R1 and FDIC-R2 operate as receivers to Signature and Bridge Bank, respectively.  FDIC-R1 will determine and pay claims under a depositor preference waterfall set out at 12 U.S.C. § 1821(d)(11).  In its corporate capacity, the FDIC insures bank

deposits and pays depositors when an insured depository institution fails.  12 U.S.C. §§ 1811, 1821(f).  The FDIC in its corporate capacity is identified in this Opinion as FDIC-C. Each is these FDIC entities is a separate legal entity.

The FDIC, in its several capacities in this action, and Flagstar have moved to dismiss the TAC for principally three reasons: the plaintiff is not entitled to the declaratory relief it seeks, the plaintiff has failed to adequately plead its claim regarding pursuit of Signature's insurance coverage, and the UCC claims are time-barred.  Their motions are granted.

I.   Claims Three and Four: Declaratory Relief

In two causes of action, the TAC asserts that the plaintiff is entitled to declaratory judgment that the DPOs are deposit liabilities of FDIC-C, FDIC-R1, FDIC-R2, and Flagstar.  With such a declaration, the plaintiff seeks a recovery that is unavailable on its general unsecured claims.  Claim Three is brought against all three FDIC entity defendants and against Flagstar.  Claim Four is brought against FDIC-C and FDIC-R1.

The Declaratory Judgment Act is "procedural only and does not create an independent cause of action." Chevron Corp. v. Naranjo, 667 F.3d 232, 244 (2d Cir. 2012)(citation omitted). Thus, a plaintiff may not use the Declaratory Judgment Act to "create legal rights that do not otherwise exist." Id. at 245. The defendants contend that the DPOs are not deposit liabilities

under § 1813(l)(1) of FIRREA.  They are correct.[3]  A claim for stolen funds is not a deposit.

The FDIC insures the deposits of all insured depository institutions.  12 U.S.C. § 1821(a)(1)(A).  A deposit, pursuant to § 1813(l)(1), is defined as

> the <u>unpaid balance of money or its equivalent received or held by a bank or savings association in the usual course of business and for which it has given or is obligated to give credit</u>, either conditionally or unconditionally, to a commercial, checking, savings, time, or thrift account, or which is evidenced by its certificate of deposit, thrift certificate, investment certificate, [or] certificate of indebtedness . . . .

12 U.S.C. § 1813(l)(1) (emphasis supplied).  "The amount of a deposit is the balance of principal and interest unconditionally credited to the deposit account <u>as of the date of default</u> of the insured depository institution, plus the ascertainable amount of interest to that date."  12 C.F.R. § 330.3(i)(1) (emphasis supplied).  Where an amount of money is not reflected in an account at the time of default, the amount cannot be recovered from the FDIC.  See <u>Villafane-Neriz v. FDIC</u>, 75 F.3d 727, 733 (1st Cir. 1996)(an amount not on the books is a general liability of the bank); <u>Raine v. Reed</u>, 14 F.3d 280, 283-284 (5th Cir. 1994)(even where the bank itself has committed a mistake,

---

[3] FDIC-C separately moves to dismiss these claims on the ground that there is no actual case or controversy between the plaintiff and FDIC-C since it is the FDIC as receiver that pays claims and not the FDIC in its corporate capacity.

regulations require that deposits be on the books of the
insolvent bank in order to be covered by deposit insurance)
(collecting cases); In re Collins Sec. Corp., 998 F.2d 551, 555
(8th Cir. 1993) (deposit insurance does not protect depositors
from the bank's pre-insolvency mistakes).

The DPOs were transferred out of the plaintiff's account in
2019, four years before Signature became insolvent and the FDIC
assumed responsibility for the plaintiff's account at Signature.
The DPOs were not reflected in the plaintiff's account at
Signature when FDIC-R1 became Signature's receiver.  The funds
at issue, therefore, were not deposits at the time of
Signature's default.  Pursuant to § 1813(l)(1) and §
330.3(i)(1), the FDIC does not assume liability for funds that
are not deposit liabilities.

Likewise, Flagstar did not assume liability for the DPOs.
The Flagstar Agreement provides that the Flagstar assumed
deposits as reflected in Bridge Bank's records.  These records
did not include the DPOs.  The third and fourth claims of the
TAC, therefore, fail.

The plaintiff does not engage with these statutory
provisions or this precedent.  Instead, it argues that it is
seeking a declaration regarding a specific account rather than
the amounts of the DPOs.  This characterization of its claims
does not succeed.  The bank records at the time of insolvency

9

control and the DPOs, which were diverted years earlier, do not appear in these records.

II.  Claim Five: 18 U.S.C. § 1821

In Claim Five, the TAC alleges that pursuant to 18 U.S.C. § 1821(d)(13), FDIC-R1 and FDIC-C[4] hold the right to pursue Signature's insurance coverage and that they violated their duty to act with commercial reasonableness by failing to pursue an insurance claim for the value of the DPOs.  The defendants argue that the plaintiff's claim should be dismissed for failure to state a claim because there is no private right of action for a § 1821(d)(13) claim and the commercial reasonableness standards upon which the plaintiff relies apply to the sale of collateral and not the pursuit of insurance claims.

Under Rule 12(b)(6), a party "must plead enough facts to state a claim to relief that is plausible on its face."  Green v. Dep't of Educ. of N.Y., 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Vengalattore v. Cornell Univ., 36 F.4th 87, 102 (2d

---

[4] Claim Five must be dismissed against FDIC-C on the ground that it does not pay the liabilities of failed banks.  To the extent a claim can be stated, it must be brought against the FDIC as receiver.

Cir. 2022) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "In determining if a claim is sufficiently plausible to withstand dismissal," a court "accept[s] all factual allegations as true" and "draw[s] all reasonable inferences in favor of the plaintiffs."  Melendez v. City of New York, 16 F.4th 992, 1010 (2d Cir. 2021) (citation omitted).

The defendants' motion to dismiss Claim Five is granted. First and foremost, § 1821(d) does not provide a private right of action.  Section 1821(d)(2)(A)(i) of FIRREA "places the FDIC in the shoes of the insolvent [bank], to work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise."  O'Melveny & Myers v. FDIC, 512 U.S. 79, 87 (1994).  Section 1821(d) outlines various duties and authority belonging to the FDIC.  Under that provision the FDIC, as receiver, may

> (i) take over the assets of and operate the insured
> depository institution with all the powers of the members
> or shareholders, the directors, and the officers of the
> institution and conduct all business of the institution;
> (ii) collect all obligations and money due the institution;
> (iii) perform all functions of the institution in the name
> of the institution which are consistent with the
> appointment as conservator or receiver; and
> (iv) preserve and conserve the assets and property of such
> institution.

12 U.S.C. § 1821(d)(2)(B).

The specific provision of FIRREA upon which the plaintiff relies, § 1821(d)(13)(E), requires the FDIC to act in a manner

that maximizes value and minimizes loss when it disposes of
assets.  It provides that

> in exercising any … authority as conservator or receiver in
> connection with any sale or disposition of assets of any
> insured depository institution for which the Corporation
> has been appointed conservator or receiver, including any
> sale or disposition of assets acquired by the Corporation
> under section 1823(d)(1) of this title, the Corporation
> shall conduct its operations in a manner which --
>
> (i) maximizes the net present value return from the sale or
> disposition of such assets; [and]
>
> (ii) minimizes the amount of any loss realized in the
> resolution of cases.

12 U.S.C. § 1821(d)(13)(E).  Nothing in these provisions
suggests that they provide a private entity with a cause of
action.

"Private rights of action to enforce federal law must be
created by Congress."  Rep. of Iraq v. ABB AG, 768 F.3d 145, 170
(2d Cir. 2014) (citing Alexander v. Sandoval, 532 U.S. 275, 286
(2001)).  In considering whether a statute confers an implied
private right of action, "the judicial task is to interpret the
statute Congress has passed to determine whether it displays an
intent to create not just a private right but also a private
remedy."  Id. (citing Sandoval, 532 U.S. at 286).

A court "must begin its search for Congress's intent with
the text and structure of the statute, and cannot ordinarily
conclude that Congress intended to create a right of action when
none was explicitly provided."  Cohen v. Viray, 622 F.3d 188,

12

193 (2d Cir. 2010) (citing <u>Sandoval</u>, 532 U.S. at 286).  In
deciding whether Congress created a private right of action, a
court may consider the factors enumerated in <u>Cort v. Ash</u>, which
are: whether the plaintiff is a member of the class for whose
special benefit the statute was created; whether there is an
indication of either an explicit or implicit legislative intent
to create or deny a private remedy; whether an implied remedy is
consistent with the underlying purposes of the statute; and
whether the cause of action is one that traditionally is
relegated to state law.  422 U.S. 66, 78 (1975).  "[W]hen
analysis of the first two <u>Cort</u> factors fails to reveal any
congressional intent to create a private right of action, the
final two factors need not be reached."  <u>Alaji Salahuddin v.
Alaji</u>, 232 F.3d 305, 309 (2d Cir. 2000).

First, the plaintiff is not a member of a class for whose
special benefit Congress created § 1821(d)(13)(E).  Congress
enacted FIRREA in 1989 as a response to massive losses which
were occurring in the nation's thrift bank industry and its
deposit insurance fund.  H.R. Rep. No. 101-54(I), at 291 (1989).
The legislative history of the statute demonstrates that the
FDIC's duty to maximize gain and minimize loss in the
disposition of assets is primarily intended to benefit American
taxpayers.  <u>See id.</u> at 514-15.

Turning to the second factor, § 1821(d)(13)(E) does not

include language implying that a private right of action exists.
Furthermore, there is no statement in FIRREA's legislative
history that points to a congressional intent to create a
private right of action to enforce the FDIC's duties under §
1821(d)(13)(E).  There are thus no grounds from which to assume
Congress intended that private parties have a right to sue under
§ 1821(d)(13)(E).  Because an examination of the first two Cort
factors fails to reveal that Congress intended to create a
private right of action, the inquiry ends.  See also Deutsche
Bank Nat. Trust Co. v. FDIC, 784 F.Supp.2d 1142, 1166 (C.D. Cal.
2011) (collecting cases), on reconsideration in part, 854
F.Supp.2d 756 (C.D. Cal. 2011), aff'd, 744 F.3d 1124 (9th Cir.
2014).

There is another independent basis for dismissal of Claim
Five.  Claim Five asserts that § 1821(d)(13) requires
compliance, by implication, with the Uniform Commercial Code
("UCC").  In its opposition to this motion, the plaintiff
identifies the provision of the UCC on which it relies as UCC §
9-625.  That provision, however, refers to the disposal of
collateral and not to the pursuit of insurance coverage, which
is the gravamen of the plaintiff's complaint in Count Five.

Section 9-625 provides, "if it is established that a
secured party is not proceeding in accordance with this article,
a court may order or restrain collection, enforcement, or

14

disposition of <u>collateral</u> on appropriate terms and conditions."
N.Y. U.C.C. § 9-625 (emphasis supplied).  Those terms and
conditions include use of commercially reasonable methods.  <u>Id</u>.
at § 9-610.  As defined in Article 9, "collateral" means the
property subject to a security interest or agricultural lien.
<u>Id</u>. at § 9-102(12).

    In opposition to this motion, the plaintiff argues that
this analysis is inapposite since it is bringing a contract
claim and not a tort claim.  The plaintiff does not, however,
identify the contract to which it is referring.  In any event,
it has not provided any ground to support a finding that there
is a private right of action to enforce § 1821(d)(13) or that
UCC § 9-610 applies to pursuit of an insurance claim rather than
the sale of collateral.  Thus, Claim Five is dismissed.

    III. Claims Nine through Twelve: Statute of Repose

    In Claims Nine through Twelve, the plaintiff seeks to hold
FDIC-R1, FDIC-R2[5] and Flagstar liable for Signature Bank's
transfers of the DPO's in violation of various sections of the
UCC.  Relying on the Funds Transfer Agreement ("Agreement") that
the plaintiff executed with Signature Bank, the defendants have

---

[5] FDIC-R2 asserts that any claims arising out of Signature's
conduct before its failure may be brought, if at all, against
FDIC-R1 only and not against FDIC-R2 or Flagstar.  Flagstar
similarly argues that it cannot be held liable for Signature's
alleged violations of the UCC.  They are both correct.

moved to dismiss these claims as brought beyond the one-year period of repose set forth in UCC § 4-A-505. Because this motion relies on evidence presented by the defendants that is not integral to the TAC, it has been converted into a motion for summary judgment.

A court may convert a motion to dismiss into a motion for summary judgment under Rule 56, Fed. R. Civ. P., when "matters outside the pleading are presented to and not excluded by the court." Fed. R. Civ. P. 12(d). A district court may not so convert a motion under Rule 12(d), however, unless "[a]ll parties [were] given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). "[T]he conversion of a Rule 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form." Palin v. N.Y. Times Co., 940 F.3d 804, 811 (2d Cir. 2019). "[T]he essential inquiry is whether the [nonmovant] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment." Id. at 811-12.

The conversion to summary judgment is appropriate here. The plaintiff was given notice that the defendants were relying, in part, on the declaration of counsel for FDIC-R1 and FDIC-R2, John N. Orsini, which includes sworn statements about the plaintiff's knowledge of the DPOs. In opposition to the

16

defendants' motion, the plaintiff offered the declaration of Yiannis Kostis, an officer of HK Capital, which included Mr. Kostis's sworn statements about the plaintiff's knowledge of the DPOs. Accordingly, all parties have had a reasonable opportunity to present supporting materials. In these circumstances, it is appropriate to convert the defendants' motion to dismiss these four claims to a motion for summary judgment.

Summary judgment may be granted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To present a genuine issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party." Horror Inc. v. Miller, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted). Material facts are those facts that "might affect the outcome of the suit under the governing law." Choi v. Tower Rsch. Cap. LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted). In considering a motion for summary judgment, a court "construe[s] the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Kee v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021) (citation omitted).

17

The Second Circuit has cautioned that "[o]nly in the rarest of cases may summary judgment be granted against a party who has not been afforded the opportunity to conduct discovery" because "the nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." Ass'n of Car Wash Owners Inc. v. City of New York, 911 F.3d 74, 83 (2d Cir. 2018) (citation omitted). Still, a

> party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit [or declaration] showing (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.

Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 303 (2d Cir. 2003) (citation omitted); see also Ass'n of Car Wash Owners, 911 F.3d at 83-84; Fed. R. Civ. P. 56(d) (formerly Fed. R. Civ. P. 56(f) (2009)). HK Capital has not submitted an affidavit describing any discovery that it requires to respond to this motion.

The defendants argue that the plaintiff's claims brought under the UCC are time-barred under the UCC's one-year statute of repose, which was incorporated through the Agreement. "Statutes of repose and statutes of limitations are often confused." Police & Fire Ret. Sys. of City of Detroit v.

IndyMac MBS, Inc., 721 F.3d 95, 106 (2d Cir. 2013)(citation omitted).  A statute of limitations "cannot begin to run until the plaintiff's claim has accrued."  City of Pontiac Gen. Emp. Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 176 (2d Cir. 2011) (citation omitted).  By contrast, "a statute of repose extinguishes a plaintiff's cause of action after the passage of a fixed period of time, usually measured from one of the defendant's acts."  Police & Fire, 721 F.3d at 106 (citation omitted) (emphasis supplied.  A statute of repose "begins to run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered" the cause of action.  Id. at 107 (citation omitted). "Statutes of repose effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time."  CTS Corp. v. Waldburger, 573 U.S. 1, 9 (2014) (citation omitted).

The defendants' summary judgment motion relies on the terms of the Agreement, which HK Capital acknowledged on November 6, 2017, when it opened its account with Signature.  Through the Agreement, the plaintiff was required to file a lawsuit concerning the DPOs within one year of notice of the transactions.  In the Agreement, the plaintiff agreed that it

must commence any legal action or proceedings against

> [Signature] Bank with respect to any alleged improper,
> erroneous, duplicate or unauthorized Funds Transfer or
> Payment Order <u>within one year of the date [plaintiff]
> received Notice</u> from [Signature] Bank <u>of the transfer</u> but
> in no event beyond the period of repose

set forth in UCC 4-A-505 (emphasis supplied).  In addition, it

agreed that it would provide Signature with notice in writing of

any discrepancies, unauthorized transactions or other errors

with respect to any bank statement or notice of a funds transfer

"[w]ithin a reasonable time <u>not exceeding 30 days</u> of the Bank

sending the Client a statement or a notice of a Payment Order or

Funds Transfer" and that such timely written notification shall

be a condition precedent[6] in any litigation "arising or resulting

from, or in any way related to, Bank's performance or non-

performance" of this Agreement "or alleged breach of any

obligation of Bank arising under Article 4-A of the UCC."

(Emphasis supplied.)

> Pursuant to UCC § 4-A-505,
>
> if a receiving bank has received payment from its customer
> with respect to a payment order issued in the name of the
> customer as sender and accepted by the bank, and the
> customer received notification reasonably identifying the
> order, the customer is precluded from asserting that the
> bank is not entitled to retain the payment unless the
> customer notifies the bank of the customer's objection
> <u>within one year</u> after the notification was received by the
> customer.

N.Y. U.C.C. § 4-A-505 ("Section 505") (emphasis supplied).

---

[6] The defendants do not argue that this action is barred because
of a failure of a condition precedent.

Section 505 is "in the nature of a statute of repose for objecting to debits made to the customer's account."  Official Comment to N.Y. U.C.C. § 4-A-505.  "[T]he obligation to refund may not be asserted by the customer if the customer has not objected to the debiting of the account within one year after the customer received notification of the debit."  Id.  Under § 505, "a bank is not required to reimburse its customer for a wire transfer processed pursuant to an unauthorized payment order if the bank's customer did not object within one year of receiving notice of the account's debit."  Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 597 F.3d 84, 88 (2d Cir. 2010). Thus, § 505 sets out a notice period during which a customer must notify a bank of an unauthorized payment order, Clemente Bros. Contracting Corp. v. Hafner-Milazzo, 23 N.Y.3d 277, 288 (N.Y. 2014), and the Agreement requires any lawsuit to be filed within that one-year notice period.

This action was filed in state court on June 14, 2021, which is more than one year after the wrongful transfers out of the plaintiff's account and also more than one year beyond the time the plaintiff was given notice of each of the DPOs through the monthly account statements.  It is undisputed that the DPOs were timely reflected in the monthly account statements provided by Signature Bank to HK Capital in the spring and summer of 2019.  It is also undisputed that plaintiff's attorney contacted

Signature Bank in October 2019 about the DPOs, reflecting the plaintiff's actual notice of the DPOs as of that time.

During the period the DPOs were issued, the plaintiff was represented by the law firm Cozen O'Connor ("Cozen").  On October 10, 2019, Cozen informed Signature's counsel that funds that had been authorized for deposit in a client account had been diverted.  Cozen observed as well that Signature's Head of Corporate Security was in the process of investigating the matter.

In opposition to this motion, the plaintiff makes three arguments.  First, it argues that the law of the case doctrine prevents this Court from revisiting the determination of the state court that these claims are not barred by the statute of repose.  Under the "law of the case" doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Frommert v. Conkright, 913 F.3d 101, 109 (2d Cir. 2019) (citation omitted).  But a court may "depart from the law of the case for cogent or compelling reasons including an intervening change in law, availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  Johnson v. Holder, 564 F.3d 95, 99-100 (2d Cir. 2009) (citation omitted).  The law of the case doctrine is "discretionary and does not limit a court's power to reconsider its own decision

prior to final judgment." Cangemi v. United States, 13 F.4th 115, 140 (2d Cir. 2021) (citation omitted).

For several reasons, the law of the case doctrine does not prevent dismissal of these four claims as time-barred. The state court erred in holding that the monthly account statements did not provide sufficient notice of the DPOs. Moreover, this Court has evidence of the plaintiff's actual notice as of October 2019 of the DPOs, evidence that was unavailable to the state court. Finally, the plaintiff has materially shifted its litigation position, which by itself allows this Court to revisit the issue. At the time of the state court's decision, the plaintiff asserted that the DPOs were authorized transfers. Now, the plaintiff argues that the DPOs were unauthorized transfers made in violation of the UCC.

Second, the plaintiff argues that the October 2019 telephone call should not be considered since the affidavit presented by defendants' counsel violates the attorney-witness rule, evidence of the October 2019 call was not presented to the state court during motion practice in 2021, Cozen had no authority to speak on behalf of the plaintiff at the time of the call, and Cozen did not provide details regarding the DPOs during the call. None of these arguments succeeds. The affidavit may be considered since it is based on personal knowledge. The attorney-witness rule bars the affiant from

23

serving as trial counsel and does not prevent consideration of his evidence now or at trial.  See Ramey v. Dist. 141, Intern. Ass'n of Machinists and Aerospace Workers, 378 F.3d 269, 283 (2d Cir. 2004).  While it would have been preferable and more efficient for the defendants to have presented this evidence to the state court judge, the failure to do so does not bar its consideration at this time.  After all, the plaintiff has amended its pleadings three times, and this is the first time this Court is considering a motion for summary judgment on these claims.

Next, while Cozen withdrew from representing the plaintiff shortly after the October 2019 call, it was still plaintiff's counsel at the time of the call and therefore spoke as plaintiff's agent.  Additionally, the telephone call reflects that the plaintiff had sufficient notice of the DPOs to trigger the one-year filing period for any lawsuit against Signature.

Third, the plaintiff argues that the defendants cannot use § 505 to shield themselves from Signature's fraud.  In making its argument, the plaintiff relies on Ma v. Merrill Lynch, which held that § 505 was not "intended to shield banks from all fraud claims."  597 F.3d at 89.  The plaintiff in Ma brought several common law fraud claims against the defendant on the grounds that the defendant's employee fraudulently executed a loan and made several wire transfers without the plaintiff's knowledge.

24

Id. at 86–87.  The plaintiff in Ma did not assert, however, that "the fraud transfers he approved were secretly misdirected," as is the case here.  Id. at 90.  Nor did the plaintiff in Ma bring claims under Article 4 of the UCC.  Pursuant to the Agreement, HK Capital's UCC claims are subject to the UCC's statute of repose and are time-barred.

## IV.  Leave to Amend

The plaintiff requests that, if the defendants' motion to dismiss is granted, it be given leave to amend the TAC.  In general, leave to amend should be "freely give[n] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Leave to amend may be denied, however, "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." Eastman Kodak Co. v. Henry Bath LLC, 936 F.3d 86, 98 (2d Cir. 2019) (citation omitted).  Additionally, a plaintiff "need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint."  TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 505 (2d Cir. 2014).

The plaintiff's request for leave to amend is denied.  The plaintiff has already amended its complaint three times.  The plaintiff was cautioned in an Order of November 20, 2023 that it was unlikely it would be given a further opportunity to amend. Finally, the plaintiff has not identified how further amendment

25

would address the deficiencies in the TAC.

### Conclusion

The motions brought by FDIC-R1, FDIC-R2, FDIC-C, and
Flagstar on February 9, 2024 are granted.  All claims against
them are dismissed.  This action remains ongoing against the
defendant Nicky G.

Dated:    New York, New York
          May 21, 2024

                                    _____
                                         DENISE COTE
                                    United States District Judge